AUSA: Shankar Ramamurthy　　Telephone: (202) 924-5368
AO 106 (Rev. 04/10) Application for a Search Warrant　　Special Agent: Tyson Howard　　Telephone: (313) 600-0490

# UNITED STATES DISTRICT COURT
for the
Eastern District of Michigan

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*
INFORMATION ASSOCIATED WITH
MJMOLLOY01@GMAIL.COM AND
MJMOLLOY@INTEGRALABSOLUTIONS.COM THAT
ARE STORED AT PREMISES CONTROLLED BY
GOOGLE, INC.

)
)
)
)
)
)
)

2:21-mc-50836
Judge: Goldsmith, Mark A.
Filed: 06-08-2021

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See ATTACHMENT A.

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See ATTACHMENT B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18 U.S.C. § 1347 | Health Care Fraud |
| Title 18 U.S.C. § 1349 | Conspiracy to Commit Health Care Fraud and/or Wire Fraud |

The application is based on these facts:

See attached AFFIDAVIT.

☐ Continued on the attached sheet.

☐ Delayed notice _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Special Agent Tyson Howard, HHS-OIG
*Printed name and title*

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date: June 8, 2021

*Judge's signature*

City and state: Detroit, Michigan

Hon. Patricia T. Morris　　U. S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH MJMOLLOY01@GMAIL.COM AND MJMOLLOY@INTEGRALABSOLUTIONS.COM THAT ARE STORED AT PREMISES CONTROLLED BY GOOGLE, INC. | Case No.<br><br>**Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR SEARCH WARRANT

I, Tyson Howard, Special Agent for the United States Department of Health and Human Services ("HHS"), Office of Inspector General ("OIG"), Office of Investigations ("OI"), being first duly sworn, hereby depose and state as follows:

## AGENT BACKGROUND AND QUALIFICATIONS

1)     I am a Special Agent with the United States Department of Health and Human Services ("HHS"), Office of Inspector General ("OIG"), assigned to the Detroit, Michigan, Field Office.  As such, I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations and to make arrests for federal felony offenses.

2)     I have been a Special Agent with HHS-OIG since May 2016. Previously, I was employed as a Special Agent with the United States Secret

Service and as an Officer with the United States Customs and Border Protection, Office of Field Operations.  I have received extensive training in federal law enforcement, including completion of the U.S. Customs and Border Protection Academy and the Criminal Investigator Training Program at the Federal Law Enforcement Training Center, Glynco, Georgia, the United States Secret Service Special Agent Training Course at the J.J. Rowley Training Center at Beltsville, Maryland, and the Department of Health and Human Services, Office of Inspector General Special Agent Basic Training at the National Training and Enforcement Operations Branch, Largo, Maryland, including other internal training courses regarding criminal investigations of health care fraud crimes. Additionally, I have completed the Basic Investigation of Computer and Electronic Crimes Program while previously employed with the United States Secret Service.

3)      As a Special Agent with HHS-OIG, I am responsible for investigating violations of United States federal law, including, but not limited to, Title 18, United States Code, Section 1347 (Health Care Fraud), Title 18, United States Code, Section 1343 (Wire Fraud), Title 18, United States Code, Section 1349 (Conspiracy to Commit Health Care Fraud and Wire Fraud), Title 18, United States Code, Section 371 (Conspiracy to Pay and Receive Illegal Remunerations), Title 42, United States Code, Section 1320a-7b(b) (Paying and Receiving Remunerations), Title 18, United States Code, Section 1035 (False Statements In A

2

Health Care Matter), and 21 United States Code, Section 841 (Unlawful Distribution of a Controlled Substance). In connection with investigating these offenses, I have participated in the execution of search warrants for documents and other evidence in cases involving violations of these offenses, including physical locations such as medical facilities, pharmacies, clinics, individuals' residences, and electronic means such as email accounts, servers, and electronic health and medical records storage systems.

4)      I, with the assistance of other HHS-OIG Special Agents and Special Agents from the Federal Bureau of Investigation ("FBI"), am investigating a health care fraud, wire fraud and illegal kickback scheme involving INTEGRA LAB MANAGEMENT LLC DBA INTEGRA LAB SOLUTIONS ("INTEGRA"), a toxicology laboratory, and its owner/operators THOMAS A HUGHES ("HUGHES"), MICHAEL J. MOLLOY ("MOLLOY"), and TEOFIL GHERASIM ("GHERASIM").

## PURPOSE OF THE AFFIDAVIT

5)      I make this affidavit in support of an application for a search warrant for information associated with certain accounts,  mjmolloy01@gmail.com ("Target Account 1") and mjmolloy@integralabsolutions.com ("Target Account 2").

6)     Target Accounts are stored at premises controlled by Google, LLC ("Google"), an electronic mail ("email") provider headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043 ("Subject Premises 1"). The information to be searched is described in the following paragraphs and in Attachment A.

7)     This affidavit is made in support of an application for a search warrant under 18 U.S.C.§§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. The government previously served preservation requests to Google for Target Accounts. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

8)     Based upon information obtained by HHS-OIG and the FBI, and a thorough review of Medicare claims data, there is probable cause to believe, and I do believe, that INTEGRA submitted and caused the submission of false and fraudulent claims to Medicare for services that were not medically necessary and/or were induced by illegal kickbacks.  Finally, the evidence also shows that the Target Accounts were used to carry out these crimes.

9)     As discussed herein, the statements in this affidavit are based upon information that I learned during the investigation, information provided to me by other law enforcement officers, and my experience and background as an HHS-OIG Special Agent.  Information pertinent to this investigation was also provided by NCI AdvanceMed (now known as CoventBridge Group), the current unified program integrity contractor in Michigan for HHS, and First Coast Service Options, Inc., the current unified program integrity contractor in Florida for HHS, both of whom are responsible for performing investigations and audits designed to protect the Medicare program ("Medicare") from fraud, waste, and abuse.  Since this affidavit is being submitted for the limited purpose of supporting a search warrant, I have not included every fact known to me concerning this investigation. I have only set forth the facts I believe are necessary to establish probable cause to believe that evidence of crime, fruits of crime, contraband, and other items illegally possessed in violation of the aforementioned federal laws are located in the Target Accounts.

10)     As discussed herein, probable cause exists to believe that, at the Subject Premises, there potentially is located certain items and property, including, but not limited to, documents, data and other evidence and fruits and instrumentalities of violations of:

a)  Title 18 U.S.C. § 1347, Health Care Fraud;

b) Title 18 U.S.C. § 1349, Conspiracy to Commit Health Care Fraud and Wire Fraud;

c) Title 42 U.S.C. § 1320a-7b(b)(2)(A), Payment of Kickbacks in Connection with a Federal Health Care Program;

d) Title 42 U.S.C. § 1320a(b)(1)(A), Soliciting and/or Receiving Kickbacks in Connection with a Federal Health Care Program;

e) Title 18 U.S.C. § 371, Conspiracy to Defraud the United States and Pay Health Care Kickbacks; and

f) Title 18 U.S.C. § 1343, Wire Fraud.

## **RELEVANT STATUTES**

(11)   Title 18, United States Code, Section 1347, prohibits health care fraud.  Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—

(1)      to defraud any health care benefit program; or

(2)      to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both.

6

(12)   Title 18, United States Code, Section 1349, provides that any person who attempts or conspires to commit health care fraud or wire fraud, shall be subject to the same penalties as those proscribed in United States Code, Section 1347 and/or Section 1343.

(13)   Title 18, United States Code, Section 24(b), defines a "health care benefit program" as, among other things, "any public or private plan . . . affecting commerce, under which any medical benefit, item or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service, for which payment may be made under the plan."

(14)   Title 42, United States Code, Section 1320a-7b(b)(2)(A), prohibits knowingly and willfully offering and paying any remuneration (including any kickback, bribe, or rebate) in return for referring an individual to a person for the furnishing or arranging of any item or service for which payment may be made in whole or part by Medicare, a federal health care benefit program as defined by 18 United States Code, Section 24(b).

(15)   Title 42, United State Code, Section 1320a-7b(b)(1)(A), prohibits the solicitation and receipt of any remuneration, whether direct or indirect, in return for referring an individual to a person for the furnishing or the arranging of furnishing of any service for which payment may be made under a Federal health care program.

(16)   Title 18, United States Code, Section 371 provides that it is a criminal offense "[i]f two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose."

(17)   Title 18, United States Code, Section 1343 prohibits wire fraud: Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.

## THE MEDICARE PROGRAM

(18)   Medicare is a federally funded health care program providing benefits to persons who are over the age of sixty-five or disabled.  Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency within the HHS.  Individuals who receive Medicare benefits are referred to as Medicare "beneficiaries."

(19)   Medicare is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

(20)   Medicare has four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D).

(21)   This investigation involves services provided by a laboratory testing service, including toxicology and urinalysis testing.  Services that were provided in connection with a laboratory testing facility, including urine drug testing, are covered by Medicare Part B.

(22)   Medicare Part B claims are processed and paid by private insurance organizations, known as fiscal intermediaries, who contract with CMS to administer their specific part of the Medicare Program.

(23)   CMS contracted with regional contractors to process and pay Medicare claims. First Coast Service Options, Inc was the contractor that processed and paid Medicare laboratory claims in Florida during the relevant time period.

(24)   By becoming a participating provider in Medicare, enrolled providers, including laboratories, agree to abide by the policies and procedures, rules, and regulations governing reimbursement.  To receive Medicare funds, enrolled providers, together with their authorized agents, employees, and contractors, are required to abide by all provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies, procedures, rules, and

9

regulations issued by CMS and its authorized agents and contractors.  Health care providers are given and provided with online access to Medicare manuals and services bulletins describing proper billing procedures and billing rules and regulations.

(25)    When a provider enrolls in Medicare, Medicare requires the provider to certify that the provider understands that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with the laws, regulations, and program instructions applicable to Medicare, including the federal Anti-Kickback Statute.  A provider also has to certify that the provider will not submit, or cause the submission of, false or fraudulent claims.  Medicare would not pay claims for services that were not medically necessary, were not provided as represented to Medicare, or procured through kickbacks or bribes in violation of Title 42 United States Code, Section 1320a-7b(b).

(26)    A provider can submit a claim to Medicare through the mail or electronically.  Every claim submitted by or on behalf of a provider certifies that the information on the claim form is truthful and that the services were reasonable and necessary to the health of the Medicare beneficiary.  Medicare only reimburses providers for services and procedures that are medically necessary.  Medicare does not pay for claims that are procured by kickbacks and bribes.

10

(27)   As part of the enrollment process, Medicare providers execute an electronic funds transfer ("EFT") agreement which authorizes the provider to receive Medicare payment via electronic funds transfer.

(28)   Through the Health Insurance portability and Accountability Act ("HIPAA") of 1996, Medicare requires a covered entity that bills Medicare, such as a home health care agency ("HHA"), to retain required documentation, including records that disclose the extent of services provided and significant business transactions, for six years from the date of its creation or the date when it was last in effect, whichever is later.

## MEDICARE URINE DRUG TESTING

(29)   Drug testing can be "presumptive" (to determine the presence or absence of an analyte) or "definitive" (to provide a numerical concentration of an analyte).  For example, if a patient is prescribed a certain drug, such as Xanax, a positive presumptive test result for benzodiazepines (of which Xanax is one) would be expected.  If the test result is negative for benzodiazepines, however, and the patient insists that she is taking her Xanax as prescribed, a definitive laboratory test to confirm whether this unexpected negative result may be reasonable and necessary.  Similarly, if a patient's presumptive test yielded a positive result for a non-prescribed or illicit drug, then a definitive laboratory test to evaluate this unexpected positive result may be reasonable and necessary.

11

(30)   Medicare's rules and regulations for urine drug testing, as detailed in a Local Coverage Determination (L34645) in place in Florida, where INTEGRA is headquartered, however, provide that definitive testing must be individualized and cannot be based on a panel of testing that is in place for every member of a physician's practice:

> A test may be followed by confirmation with a second method, only if there is a positive or negative inconsistent finding from the qualitative/presumptive test in the setting of a symptomatic patient, as described below.
>
> ***
>
> Definitive drug testing is indicated when:
> 1. The results of the screen are presumptively positive.
> 2. Results of the screen are negative and this negative finding is inconsistent with the patient's medical history.
> 3. This test may also be used, when the coverage criteria of the policy are met AND there is no presumptive test available, locally and/or commercially, as may be the case for certain synthetic or semi-synthetic opioids.

(31)   The reimbursement rates paid by Medicare for definitive urine drug testing are determined by the number of classes of drugs that are tested.  The billing codes for definitive drug testing range from the lowest reimbursement rate for 1-7 classes of drugs (CPT Code G0480)[1], to 8-14 classes of drugs (CPT Code

---

[1] The American Medical Association ("AMA") developed a listing of descriptive terms and identifying codes for reporting medical services and procedures that are performed by physicians.  This listing is known as the Physician's Current Procedural Terminology ("CPT") and it is published in an annually updated book that is referred to as the CPT Code Book.

12

G0481), 15-21 classes of drugs (CPT Code G0482), and the highest reimbursement rate (CPT Code G0483) for more than 22 classes of drugs (Classes of drugs include Amphetamines, Barbiturates, Benzodiazepines, Methadone, and Opiates).

## OVERALL FRAUD SCHEME

(32)   The investigation has revealed that INTEGRA and its owners and operators, including HUGHES, MOLLOY, and GHERASIM, engaged in a scheme with Infinity Visiting Physician Services PLC ("Infinity"), by and through its owner/operator Radwan Malas ("Malas"), to submit and cause the submission of false and fraudulent claims to Medicare for urine drug testing that was either medically unnecessary and/or obtained by paying illegal kickbacks.

(33)   From March 2018 to March 2019, INTEGRA submitted at least 1851 claims for reimbursement from Medicare for urine drug testing referred by Infinity physicians. INTEGRA billed Medicare for approximately $1,432,434 on these claims and was reimbursed $365,815.

(34)   HUGHES, MOLLOY, and GHERASIM paid Malas to induce referrals from physicians employed by Infinity to INTEGRA for definitive urine drug testing. INTEGRA paid Malas at least $10,800 per month from at least March 2018 through March 2019 for urine drug testing referred by Infinity physicians to INTEGRA.

13

(35)   Between March 2018 and March 2019, approximately 97.7% (1810 out of 1851) of the urine drug tests referred by Infinity physicians to INTEGRA were under the highest-reimbursing procedure code (CPT Code G0483) for definitive drug testing. In my training and experience, the repeated and disproportionate billing of the highest-reimbursing code for nearly all patients is indicative of health care fraud.

## PROBABLE CAUSE

### A.    Medicare Records/Data

(36)   INTEGRA is a toxicology laboratory based in Jupiter, Florida, and has been a Medicare enrolled provider since at least January 1, 2015.  Internal Revenue Service records submitted by INTEGRA to CMS indicate HUGHES was the filing member for its Taxpayer Identification Number via Form SS-4 as of October 31, 2014.  Additionally, HUGHES signed the W-9 Request for Taxpayer Identification Number and Certification on October 22, 2015.  Medicare enrollment records state that as of July 1, 2017, HUGHES was listed as the Authorized Official, Managing Employee, and 5% or greater owner of INTEGRA.

(37)   Medicare claims data indicates that from July 1, 2017, to the March 12, 2020, when INTEGRA ceased operation, it billed Medicare approximately $7,733,815.85 million in connection with approximately 9,423 claims for urine drug testing.  Medicare paid INTEGRA approximately $1,982,518.06 in

14

connection with those claims.  INTEGRA stopped billing Medicare permanently in March 2020.

(38)   Medicare enrollment records also indicate that on July 1, 2017, HUGHES certified to Medicare that he would comply with all Medicare rules and regulations, including that he would not knowingly submit, or cause the submission of false and fraudulent claim for payment by Medicare and would comply with the federal Anti-Kickback Statute.

### B.   Corporate Records

(39)   According to corporate documents from the Michigan Licensing and Regulatory Affairs ("LARA"), INTEGRA is a domestic corporation incorporated in Florida.  HUGHES is listed as a registered agent beginning in December 2017.

### C.   Bank Records

(40)   According to PNC Bank records obtained and reviewed by investigators, Account No. XXXXXX8964 was opened in January 2015, with HUGHES listed as a signatory on the account for the entire life of the account. PNC bank records demonstrated that between March 30, 2018 and March 13, 2019, 12 checks totaling $129,600 were written out of PNC Bank Account No. XXXXXX8964, held in the name of INTEGRA, to Pegasus Management Associates, LLC ("Pegasus"). HUGHES signed each of the 12 checks to Pegasus., including between March 2018 through March 2019.

15

(41)    All 12 checks from INTEGRA PNC Bank Account No. XXXXXX8964 were deposited into J.P. Morgan Chase Bank Account No. XXXXX0069, held in the name of Pegasus Management Associates, LLC. According to J.P. Morgan Chase Bank records, Account No. XXXXX0069 was opened by Malas on March 21, 2018; nine days before receiving the first check from INTEGRA. Malas is the sole signatory on the account and has been for the entire life of the account.

### C.    Statements from MOLLOY

(42)    On April 26, 2021, federal agents, including your affiant, interviewed MOLLOY. MOLLOY admitted that INTEGRA paid Malas, through Pegasus, for the purpose of soliciting urine samples from Infinity, for drug testing that was then billed to Medicare by INTEGRA.

(43)    MOLLOY told agents that he and GHERASIM operated a prior toxicology lab through May 2017, at which point it was acquired by INTEGRA. MOLLOY and GHERASIM were made minority owners of INTEGRA, with HUGHES as the majority owner.

(44)    MOLLOY explained that GHERASIM approached HUGHES and MOLLOY about engaging in a relationship with Malas for the purpose of obtaining urine samples that could be drug tested by INTEGRA and billed to Medicare. GHERASIM had a prior business relationship with Malas related to

16

blood testing.

(45)    MOLLOY, HUGHES, and GHERASIM, met with Malas on or before

May 2018, to discuss the relationship between INTEGRA and Malas. The meeting

took place at Malas' office within the Infinity business facility. During the meeting

Malas proposed that he be paid a set fee per month in exchange for directing

referrals for urine drug testing from physicians employed by Infinity, to

INTEGRA.

(46)    MOLLOY, HUGHES, and GHERASIM agreed to pay Malas a per-

month fee in exchange for urine sample referrals. MOLLOY, HUGHES, and

GHERASIM, agreed to a per-month payment of $10,800. The amount was

determined based on the number of samples Malas claimed Infinity could generate

for referral to INTEGRA. The kickback relationship was codified in a written

agreement.

(47)    Between March 2018 and March 2019, 12 checks were issued from

INTEGRA to Pegasus, totaling $129,600 and signed by HUGHES. Some of these

checks were mailed by HUGHES from his place of residence in Florida directly to

Malas. On several occasions, MOLLOY picked up the checks from HUGHES in

Florida and hand-delivered them to Malas.

(48)    MOLLOY communicated with at least HUGHES and GHERASIM

about INTEGRA's kickback relationship with Malas, Medicare billing and

17

reimbursements as a result of the kickbacks, and INTEGRA's financial outlook, by email during the entire period of INTEGRA's operation in Michigan (approximately May 2017 through March 2020), including the time periods during which INTEGRA made kickback payments to Malas. MOLLOY communicated with HUGHES and GHERASIM using the following email addresses:

      a.  mjmolloy01@gmail.com

      b.  mjmolloy@integralabsolutions.com

(49)   Agents spoke with MOLLOY again on June 2, 2021, about the contents of e-mails between himself and his co-owners, HUGHES and GHERASIM. He explained the following:

(50)   Integra was referred urine samples from Infinity from at least May 2017 through March 2020.

(51)   From at least May 2017 through March 2020, MOLLOY received periodic e-mails into Target Account 1 and/or Target Account 2, from HUGHES providing data on the business generated by urine samples submitted to INTEGRA, including business generated by urine samples referred by Infinity.

(52)   MOLLOY e-mailed with both HUGHES and GHERASIM using Target Accounts 1 and/or 2, beginning in or around January or February 2018 concerning the details of a financial relationship with Malas to receive urine samples in exchange for monthly payments. The e-mails included details of

18

arranging meetings and the possible terms of the agreement.

(53) After meeting with Malas to discuss the kickback relationship, MOLLOY recalls e-mails with both HUGHES and GHERASIM using Target Accounts 1 and 2 to discuss the specific terms of the relationship.

(54) Throughout the approximately one-year period during which INTEGRA paid Malas for urine samples to be billed to Medicare, MOLLOY recalls e-mailing with both HUGHES and GHERASIM about requests made by Malas to increase the amount he was compensated.

(55) MOLLOY received emails from at least HUGHES and GHERASIM about business related to INTEGRA, including the payment of kickbacks to Malas, Medicare billing and reimbursements as a result of the kickbacks, and INTEGRA's financial outlook, during the entire period of INTEGRA's operation (approximately May 2017 through March 2020), including the time periods during which INTEGRA made kickback payments to Malas.

(56) Throughout INTEGRA's operation, MOLLOY used both Target Accounts 1 and 2 to e-mail with Malas about the business relationship between Integra and Infinity.

**D. Sample E-mails from MOLLOY Accounts**

(57) MOLLOY provided a sample set of e-mails to federal agents from Target Accounts 1 and 2, showing that he engaged in discussions with Malas,

19

HUGHES, and/or GHERASIM, concerning the marketing and kickback relationship between INTEGRA and Infinity.

(58)   For example, on January 19, 2018, MOLLOY sent an email from Target Account 2 to Malas providing a draft marketing employment agreement. The attached agreement set forth the duties of the marketer to include "perform marketing and business development services on behalf of Employer for individuals and/or entities who engage Employer to provide laboratory testing services (the "Clients)."

(59)   On March 16, 2018, MOLLOY's Target Account 2 was copied on an e-mail from HUGHES to Malas, and including GHERASIM, in which HUGHES discussed the terms of an agreement between INTEGRA and Malas for urine sample referrals and advocating for the inclusion of specific terms. Malas responded to the e-mail, including MOLLOY, HUGHES, and GHERASIM, and offered his perspective on whether certain condition should be included in the agreement.

(60)   On October 31, 2018 and January 24, 2019, MOLLOY communicated with HUGHES and GHERASIM using Target Account 1, concerning the hiring of medical assistants to collect urine samples from various physician practice groups; these medical assistants have knowledge of the health care fraud and kickback scheme described in this affidavit.

(61)   As recently as April 29, 2021, MOLLOY received an e-mail from HUGHES into Target Account 1, which included a draft copy of the agreement INTEGRA entered into with Malas, by and through Pegasus, to pay Malas for urine samples.

### E.   Dr. Abou Rass Statement

(62)   Agents interviewed Dr. Hassan Abou-Rass on four separate occasions between November 15, 2019, and May 27, 2020. Dr. Abou-Rass was a physician employed by Infinity from at least May 2016 through July 2019.

(63)   Medicare data shows that between March 2018 and March 2019, Dr. Abou-Rass referred approximately 1276 urine samples to INTEGRA for drug testing that were subsequently billed to Medicare by INTEGRA, in the amount of $1,090,844. INTEGRA was paid $285,873.08 on these claims. Dr. Abou-Rass referred more samples to INTEGRA for drug testing during this period than any other physician.

(64)   During these interviews, Dr. Abou-Rass provided the following information relevant to the kickback relationship between INTEGRA and Infinity:

(65)   Dr. Abou-Rass told agents that while he worked for Infinity he discovered from a review of patient charts that Malas was sending referrals for urine drug testing to INTEGRA for Abou-Rass's patients, without an order from

Abou-Rass.  Dr. Abou-Rass knew "Teo," who is known to me to be GHERASIM, as a contractor for INTEGRA who interacted with Malas.

(66)   Dr. Abou-Rass told agents that he confronted GHERASIM about referrals for urine drug testing being submitted by Malas to INTEGRA without Abou-Rass's order. GHERASIM responded to Abou-Rass that he processed urinalysis at Malas' order. GHERASIM told Abou-Rass that Malas sent requests for lab tests directly to GHERASIM through a cell phone text messaging application, WhatsApp.

(67)   Dr. Abou-Rass told agents that he was aware Malas received $50 per patient urine drug test referred to INTEGRA. He learned this from conversations with Malas. Dr. Abou-Rass recalled that during every Infinity staff meeting, Malas would tell staff that Infinity was not making enough money and that personnel needed to order additional labs. Malas did not state during these meetings that additional labs should be based on medical necessity.

## PROBABLE CAUSE
## REGARDING THE USE OF THE TARGET ACCOUNTS TO EXECUTE THE SCHEME

(68)   Records obtained from Google via grand jury subpoena relating to Target Account 1 indicate that the account was created on November 28, 2006. The name affiliated with the account is "Mike Molloy."

22

(69)    Records obtained from Google via grand jury subpoena relating to Target Account 2 indicate that the account was created on May 16, 2017.  The recovery phone number associated with the account is (734) 772-5659. The recovery email associated with the account is Target Account 1. The name affiliated with the account is "Mike Molloy."

(70)    On April 27, 2021, pursuant to 18 U.S.C. § 2703(f), the government sent Google a request to preserve all stored records, communications, and other evidence associated with Target Account 1 for 90 days.

(71)    On May 10, 2021 pursuant to 18 U.S.C. § 2703(f), the government sent Google a request to preserve all stored records, communications, and other evidence associated with Target Account 2 for 90 days.

(72)    In general, an email that is sent to a Google subscriber is stored in the subscriber's "mailbox" on the company's servers until the subscriber deletes the email. If the subscriber does not delete the message, the message can remain on the servers indefinitely. Even if the subscriber deletes the email, it may continue to be available on the servers for a certain period of time.

(73)    The statements from MOLLOY demonstrate that he used Target Accounts 1 and 2 to communicate with GHERASIM and HUGHES. In particular, the communications sent and received through Target Accounts 1 and 2 between MOLLOY, GHERASIM, and HUGHES, concerned INTEGRA business dealings,

23

including the creation and ongoing details of the relationship between INTEGRA and Malas.

(74)   Based on the facts as set forth in this Affidavit, there is probable cause to believe that the property described in Attachment A was used to carry out the fraud scheme described herein, and will contain evidence or instrumentalities of these crimes, as further described in Attachment B.

(75)   I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require the Subject Premises to disclose to the government copies of communications concerning INTEGRA's payment of kickbacks to Malas, medical records, and other information particularly described in Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

(76)   Based on the foregoing, there is probable cause to believe, and I do believe, that the Subject Premises, further described in Attachment A, will contain the items set forth in Attachments B, which constitute evidence, fruits of crime, contraband, and/or instrumentalities of the violations of Title 18 U.S.C. § 1347, Health Care Fraud, Title 18 U.S.C. § 1343, Wire Fraud, Title 18 U.S.C. § 1349,

24

Conspiracy to Commit Health Care Fraud and/or Wire Fraud, Title 42 U.S.C. § 1320a-7b(b)(2)(A), Payment of Kickbacks in Connection with a Federal Health Care Program; Title 42 U.S.C. § 1320a(b)(1)(A), Soliciting and/or Receiving Kickbacks in Connection with a Federal Health Care Program, Title 18 U.S.C. § 371, Conspiracy to Defraud the United States.

## <u>REQUEST FOR SEALING</u>

(77)   It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

Tyson Howard, Special Agent
HHS-OIG

Sworn to before me and signed in my
Presence and/or by reliable electronic means,

Hon. Patricia T. Morris
United States Magistrate Judge

26

# **ATTACHMENT A**

## **Property To Be Searched**

This warrant applies to information associated with the following email addresses:

- mjmolloy01@gmail.com ("Target Account 1")
- mjmolloy@integralabsolutions.com ("Target Account 2")

that is stored at premises owned, maintained, controlled, or operated by Google, Inc., a company headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043.

## ATTACHMENT B

### I.    Particular Things To Be Seized

All records and information in Target Accounts 1 and 2 including evidence, contraband, fruits, or instrumentalities of violations of Title 18 U.S.C. § 1347 (Health Care Fraud), Title 18 U.S.C. § 1343 (Wire Fraud), Title 18 U.S.C. § 1349, (Conspiracy to Commit Health Care Fraud/Wire Fraud), Title 42 U.S.C. § 1320a-7b(b)(2)(A) (Payment of Kickbacks in Connection with a Federal Health Care Program); Title 42 U.S.C. § 1320a(b)(1)(A) (Soliciting and/or Receiving Kickbacks in Connection with a Federal Health Care Program), Title 18 U.S.C. § 371 (Conspiracy to Defraud the United States and Pay Health Care Kickbacks) (the "Subject Offense/s"), namely:

a.     The contents of all emails associated with Target Accounts 1 and 2 from May 1, 2017 to the present, including stored or preserved copies of emails sent to and from the accounts, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.     All records or other information regarding the identification of the accounts, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which each account

was created, the length of service, the IP address used to register each account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

      c.    The types of service utilized;

      d.    All GSuite or Google Domain information stored on Target Accounts 1 and 2 from May 1, 2017, to the present, by an individual using the accounts, including but not limited to address books, contact and buddy lists, calendar data, pictures, and files;

      e.    All records pertaining to communications between Google and any person regarding the accounts, including contacts with support services and records of actions taken; and

      f.    For all information required to be disclosed pursuant to this warrant, the physical location or locations where the information is stored.

Google, Inc. is hereby ordered to disclose the above information to the government within 14 days of the issuance of this warrant.

## II.      Search Procedures for Handling Potentially Privileged Information

1.      The following procedures will be followed at the time of the search in order to avoid unnecessary disclosures of privileged information.

2.      These procedures will be executed by: (a) law enforcement personnel conducting the investigation and search and other individuals assisting law enforcement personnel in the search, including any prosecutor participating in the investigation (the "Search Team") (b) individual(s) not participating in the investigation of the matter, who will be available to assist in the event that a procedure involving potentially privileged information is required (the "Privilege Review Team"); and (c) the Special Matters Unit ("SMU") of the Criminal Division, Fraud Section.  SMU attorneys and support staff are not and will not become part of the prosecution team, and have a separate reporting chain from the prosecution team.

3.      Upon receipt of electronic data such as an email account for a filter review, the SMU will review the identified electronic data as set forth herein for potentially privileged information.

4.      The Search Team will, in their discretion, either copy the electronic data, and transport the electronic data to an appropriate law enforcement laboratory

or similar facility to be copied at that location, or provide the material directly to the SMU.

5.      The SMU, in consultation with the Search Team, will compile a list of "privilege search terms" to be used to electronically search the electronic data, including specific names and generic words intended to identify potentially privileged information.  The SMU will conduct an electronic review of the electronic data using the privilege search terms, and by using search protocols specifically chosen to identify and segregate documents or data containing potentially privileged information.  All of the data contained in the electronic data capable of containing any of the items to be seized may be reviewed using this procedure.  Documents or data that are identified by this review as not potentially privileged, including documents that do not contain the privilege search terms, may be released to the Search Team without court intervention.  Notwithstanding the procedures set forth in this paragraph, where a Search Team member otherwise reviews documents not previously determined to contain potentially privileged information, and later determines that such documents may be potentially privileged, the documents will then be provided to a Privilege Review Team member and handled in accordance with the procedures described in this paragraph.

6.      Documents or data identified during the initial privilege search terms review to be potentially privileged will be segregated.  An SMU attorney may thereafter review the segregated documents to confirm whether or not they contain potentially privileged information.  If the SMU attorney determines the documents or data are not potentially privileged, they may be given to the Search Team.  If at any point the Search Team identified any data or documents that they believe to be potentially privileged, they will cease the review and refer the materials to the SMU for further review by the SMU.  If the SMU attorney determines that documents are potentially privileged, the SMU attorney may do any of the following: (a) apply ex parte to the court for a determination whether or not the documents contain privileged information; (b) defer seeking court intervention and instead segregate the documents in a manner that makes them inaccessible to the search team; or (c) disclose the documents to the potential privilege holder, request a privilege log if the potential privilege holder asserts privilege, and seek a ruling from the court regarding the documents if the parties cannot reach agreement.

7.      In performing the reviews, both the SMU and the Search Team may search for and attempt to recover:

a.      deleted, "hidden," or encrypted data;

b.      Records and information indicating the identity and location (both past and present) of the person(s) who use or access the Target Accounts or who

exercise in any way any dominion or control over the accounts, including but not limited to associated email accounts and other internet-based accounts, login Internet Protocol ("IP") addresses, and session times and durations;

c.      use tools to exclude normal operating system files and standard third-party software that do not need to be searched; and

d.      use forensic examination and searching tools, such as Relativity, Cellebrite, EnCase and FTK (Forensic Tool Kit).

8.      If the search determines that the electronic data does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, delete or destroy all forensic copies thereof.  If the search determines that the electronic data does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

9.      If the search determines that the electronic data is (a) itself an item to be seized and/or (b) contains data falling within the list of other items to be seized, the government may retain forensic copies of the electronic data but may not access data falling outside the scope of the other items to be seized absent further court order or written consent of the property owner.

## <u>CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)</u>

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct.  I am employed by Google Inc., and my official title is _____.  I am a custodian of records for Google.  I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of Google, and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

b.      such records were kept in the ordinary course of a regularly conducted business activity of Google; and

c.      such records were made by Google as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.

_____      _____
Date                                         Signature

AUSA:   Shankar Ramamurthy          Telephone:  (202) 924-5368

AO 93  (Rev. 11/13) Search and Seizure Warrant       Agent:          Tyson Howard           Telephone:   (313) 600-0490

# UNITED STATES DISTRICT COURT

for the
Eastern District of Michigan

<table>
<tr><td>In the Matter of the Search of<br><br><i>(Briefly describe the property to be searched<br>or identify the person by name and address)</i><br>INFORMATION ASSOCIATED WITH<br>MJMOLLOY01@GMAIL.COM AND<br>MJMOLLOY@INTEGRALABSOLUTIONS.COM THAT<br>ARE STORED AT PREMISES CONTROLLED BY<br>GOOGLE, INC.</td><td>)<br>)<br>)<br>)<br>)<br>)<br>)</td><td>Case No.</td><td>2:21-mc-50836<br>Judge: Goldsmith, Mark A.<br>Filed: 06-08-2021</td></tr>
</table>

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Northern _____ District of _____ California _____ .
*(identify the person or describe the property to be searched and give its location)*:

See ATTACHMENT A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See ATTACHMENT B.

**YOU ARE COMMANDED** to execute this warrant on or before _____ June 22, 2021 _____ *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ the presiding United States Magistrate Judge on duty _____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   _____ June 8, 2021    9:26 am _____

_____
*Judge's signature*

City and state:   _____ Detroit, Michigan _____          Patricia T. Morris     U. S. Magistrate Judge
_____
*Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*